IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ANTHONY W. MILLER, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-267 |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Anthony W. Miller, seeks judicial review of a

decision of Defendant, Commissioner of Social Security

("Commissioner"), denying his applications for disability

insurance benefits ("DIB") and supplemental security income

("SSI") under Titles II and XVI, respectively, of the Social

Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.  Presently

before the Court are the parties' cross-motions for summary

judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth

below, Plaintiff's motion for summary judgment will be granted

with respect to his request for a remand of this case for further

proceedings, and the Commissioner's cross-motion for summary

judgment will be denied.

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on February 19, 2004, alleging disability since October 31, 2003 due to pain from arthritis throughout his body and "bad nerves." (R. 96-97). Following the denial of his applications, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 40-44). At the hearing, which was held on February 18, 2005, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 482-523). On April 27, 2005, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI, concluding that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy at the medium exertional level.[1]

Plaintiff's request for review of the ALJ's decision was granted by the Appeals Council on October 25, 2005, and the case was remanded to the ALJ for further proceedings. Specifically, the ALJ was directed (a) to clarify the physical limitations resulting from Plaintiff's back impairments; (b) to explain further his determination that Plaintiff's allegations of totally

---

[1]The Social Security Regulations define RFC as the *most* a claimant can still do despite his or her limitations. *See* 20 C.F.R. §§ 404.1545 and 416.945. Medium work involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *See* 20 C.F.R. §§ 404.1567(c) and 416.967(c).

2

disabling pain were not fully credible; and (c) to evaluate Plaintiff's morbid obesity in light of Social Security Ruling 02-1p.[2]  (R. 278-82).

A further hearing on Plaintiff's applications for DIB and SSI was held by the ALJ on February 17, 2006.  Plaintiff and another VE testified at the second hearing.  (R. 524-60).  On July 28, 2006, the ALJ issued a new decision denying Plaintiff's applications for DIB and SSI.  In his second decision, the ALJ concluded that Plaintiff retained the RFC to perform work existing in significant numbers in the national economy at the light exertional level.[3]  (R. 18-29).

Plaintiff requested review of the ALJ's second decision. (R. 14).  However, the request was denied by the Appeals Council on November 2, 2006.  (R. 8-10).  As a result, the ALJ's second decision became the final decision of the Commissioner.  This appeal followed.

## B. Hearing Testimony

Plaintiff's testimony during the hearings before the ALJ may be summarized as follows:

---

[2]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

[3]Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).

3

## February 18, 2005 Hearing

Plaintiff was born on September 29, 1962,[4] and he is a high school graduate. Plaintiff is 5'8" tall, and he weighed 316 pounds.[5] (R. 488-89). Plaintiff resided with his girlfriend, her two children (a 12-year old girl and an 11-year old boy) and their two-week old daughter.[6] (R. 490). Between 1988 and his alleged onset of disability in October 2003, Plaintiff worked as a construction laborer and mason. (R. 492-93).

With regard to impairments, Plaintiff suffers from disc disease in the lumbar spine. (R. 495). In June 2004, Plaintiff underwent surgery to fuse vertebrae in his thoracic spine as a result of injuries sustained in an automobile accident. Following the surgery, Plaintiff's doctor placed restrictions on him with respect to lifting, bending and twisting. (R. 497-99). Morphine and Percocet were prescribed by Plaintiff's primary care physician, Dr. Donald Ratchford, to control his back pain.[7] (R.

---

[4]At the time of the first hearing, Plaintiff was 42 years old which is defined in the Social Security Regulations as a "younger individual." *See* 20 C.F.R. §§ 404.1563 and 416.963(c).

[5]Plaintiff testified that his weight was "usually around 200," but that he had gained weight in "the last couple of months." (R. 489).

[6]Plaintiff also has two sons. At the time of the first hearing, the sons were ages 19 and 20. (R. 491).

[7]Morphine, a narcotic, is used to relieve moderate to severe pain. It is only used by patients who are expected to need medication to relieve moderate to severe pain around-the-clock for longer than a few days. Percocet, or Oxycodone, is used to

4

495-96). Plaintiff also suffers from "mood swings." Plaintiff
was being treated for this problem by a therapist, as well as a
psychiatrist, Dr. Maryanne Martin, who prescribed Wellbutrin and
Paxil for Plaintiff.[8]  (R. 496-97, 504).

Due to back pain and obesity, Plaintiff had difficulty
putting on his pants, shoes and socks. Plaintiff was able to
make a sandwich, prepare soup and put a meal in the microwave,
and he did the laundry and occasionally washed the dishes.
However, he never shopped or carried grocery bags from the car.
Plaintiff had not driven an automobile since the accident in June
2004, because his license was suspended. Plaintiff's "life" was
watching television, although he had difficulty concentrating.
He did not engage in any social activities, and he had no
hobbies. Once a month, Plaintiff went to his mother's house.
(R. 499-503, 507). Plaintiff had difficulty sleeping due to
breathing problems.[9]  (R. 506-07).

With respect to physical capacities, Plaintiff could walk

---

relief moderate to moderate-to-severe pain. www.nlm.nih.gov/
medlineplus/druginfo (last visited 3/17/2008). On a scale of 1
to 10, Plaintiff testified that his pain was a 3 or 4 with the
Morphine and Percocet. (R. 506).

[8]Wellbutrin is used to treat depression, and Paxil is used
to treat depression, panic disorder and social anxiety disorder.
www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

[9]With regard to Plaintiff's sleep difficulties, he
testified: "They wanted me to have a sleep disorder test, but I
just never had it done." (R. 506).

5

two blocks before he had to sit down and rest; Plaintiff could sit for 15 to 20 minutes before he had to get up and walk around; and Plaintiff could stand for 20 to 30 minutes. (R. 504). As to lifting and carrying, Plaintiff could lift a gallon of milk and carry it approximately 10 feet. However, the lifting and carrying caused pain. Finally, Plaintiff's ability to engage in manipulative activities with his hands was limited due to carpal tunnel syndrome.[10] (R. 508-09).

## February 17, 2006 Hearing

Since November 2005, Plaintiff had been living in a camper that belonged to a friend. (R. 540). Following the previous hearing, Plaintiff was diagnosed with arthritis in his knees which caused constant pain. Plaintiff's back and hip pain had not changed since the previous hearing. It was "always there." (R. 535-37). Plaintiff's medications included Wellbutrin, Paxil, Lasix, Aspirin, Lopressor, Percocet and an Albuterol inhaler.[11]

---

[10]Carpal tunnel syndrome is compression of the median nerve at the wrist, which may result in numbness, tingling, weakness, or muscle damage in the hand and fingers. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 3/17/2008). Approximately 15 years before the hearing, Plaintiff underwent surgery for carpal tunnel syndrome. (R. 509).

[11]Lasix, a "water pill", is used to reduce the swelling and fluid retention caused by various medical conditions, including heart disease and high blood pressure. Prescription aspirin is used to relieve the symptoms of various medical conditions, including rheumatoid arthritis and osteoarthritis. Lopressor is used alone or in combination with other medications to treat high blood pressure. Albuterol is used to prevent and treat wheezing, difficulty breathing and chest disease caused by lung diseases

6

(R. 533-34). The medication prescribed for Plaintiff's depression was effective. He no longer experienced mood swings unless he missed a dose of his medication. (R. 538). Nevertheless, Plaintiff's mental impairment affected his ability to concentrate. (R. 539).

Plaintiff's ability to walk continued to be limited to 2 or 3 blocks before he had to sit down and rest. Plaintiff could sit for about 15 minutes before he had to get up and move around for about 15 minutes, and he could stand for about 10 minutes, a decrease since the previous hearing. Plaintiff also continued to have difficulty sleeping. (R. 536-37). Plaintiff had undergone surgery for carpal tunnel syndrome on his left hand approximately 15 years before the hearing; however, the surgery "didn't work."[12] Plaintiff continued to have difficulty holding objects weighing more than a gallon of milk, and he could hold a gallon of milk only for short periods. (R. 538-39).

Plaintiff attributed his inability to perform jobs such as sitting at a table affixing stamps to envelopes or watching video surveillance of a parking lot to his lack of concentration and his inability to bend, twist or sit very long. When asked what he does all day, Plaintiff testified that he "just flip[s] the

_____

such as asthma and chronic obstructive pulmonary disease. www. nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

[12]Plaintiff, who is right handed, testified that his right hand is "actually worse" than his left hand now. (R. 539).

7

TV" or plays cards or board games for short periods with the
people with whom he resides. Plaintiff weighed 301 pounds, which
affected his ability to dress himself and to shower. Also,
Plaintiff could not go anywhere without a cane, which had been
prescribed by an Emergency Room physician in September 2005. (R.
540-41).

## C. Vocational Expert Testimony

At the second hearing on Plaintiff's applications for DIB
and SSI, the ALJ asked the VE to assume a hypothetical individual
of Plaintiff's age, education and work experience who was capable
of performing medium work with the following limitations: (1)
only occasional crouching and crawling; (2) no use of ropes,
ladders or scaffolds; (3) no prolonged exposure to extreme cold
temperatures or extreme wetness and humidity; and (4) involving
no more than simple, repetitive tasks and simple work-related
decisions. (R. 545-46). The ALJ then asked the VE whether there
were any jobs that the hypothetical individual could perform.
The VE responded affirmatively, identifying the medium exertional
level jobs of janitor and stocker, the light exertional level
jobs of ticket taker and linen room aide and the sedentary
exertional level jobs of envelope sorter in a college mail room,
tester of small electronic parts and hand bagger of small

8

accessories.[13]   (R. 548-51).

With respect to the expectations of an employer in a competitive work environment, the VE testified that an employee is expected to work 8 hours a day, 5 days a week with 15-minute breaks in the morning and afternoon, a one hour lunch break and, at most, 12 to 15 absences a year. The VE further testified that an employer expects an employee to be "on task" at least 90% of the time. Finally, the VE testified that an employee's inability to meet these expectations would preclude full-time employment in a competitive work environment. (R. 551-52).

Plaintiff's counsel asked the VE whether a person who needed to rest for 15 minutes after one hour of work could perform the jobs the VE identified in response to the ALJ's hypothetical question, and the VE testified that he or she could not. Plaintiff's counsel also asked the VE whether a person whose ability to concentrate was interrupted frequently could perform

---

[13]Under the Social Security Regulations, a person who retains the RFC to perform medium work is considered capable of performing light and sedentary work as well. *See* 20 C.F.R. §§ 404.1567(c) and 416.967(c). As a result, in addition to work at the medium level of exertion, the VE identified light and sedentary exertional level jobs in response to the ALJ's hypothetical question. Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *See* 20 C.F.R. §§ 404.1567(a) and 416.967(a).

9

the jobs identified in response to the ALJ's hypothetical

question, and the VE testified that an inability to concentrate

without frequent interruptions would eventually preclude the

person from maintaining full-time work in a competitive

environment. (R. 553-55).

## D. Medical Evidence

The medical evidence in the administrative record may be

summarized chronologically as follows:

On May 13, 2003, Plaintiff was seen by Dr. Ratchford, his

primary care physician, for complaints of panic attacks and

increased anxiety and stress. Plaintiff reported that he had

moved in with his girlfriend who had a child with attention

deficit hyperactivity disorder; that he had quit his job due to

problems with his boss; that he continued to smoke up to five

packs of cigarettes a day; and that he experienced some

exertional shortness of breath. Dr. Ratchford prescribed Zoloft

for Plaintiff's anxiety and a Combivent inhaler for shortness of

breath,[14] and he counseled Plaintiff on his smoking abuse. At the

time of this office visit, Plaintiff weighed 233 pounds. (R.

149).

---

[14]Zoloft is used to treat depression, obsessive-compulsive
disorder, panic attacks, posttraumatic stress disorder and social
anxiety disorder. A Combivent inhaler is a combination of
Albuterol and another medication that is used to prevent
wheezing, difficulty breathing, chest tightness and coughing in
people with chronic obstructive pulmonary disease and emphysema.
www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

10

On November 10, 2003, shortly after his alleged onset date
of disability, Plaintiff was seen by Dr. Ratchford for bilateral
hip pain which was aggravated by his job which involved heavy
lifting. At the time of this office visit, Plaintiff weighed 274
pounds, a gain of 41 pounds since his last office visit in May
2003. Dr. Ratchford diagnosed Plaintiff with bilateral bursitis
of the hips, and he prescribed heat, non-steroidal medication and
range of motion exercises. (R. 146).

Plaintiff saw Dr. Ratchford on November 24, 2003 to follow-
up on his hip pain. Plaintiff reported that the pain was more
severe in the left hip and that his hips hurt when he walked.
Plaintiff weighed in at 285 pounds, a gain of 11 pounds in 2
weeks. Dr. Ratchford's assessment was bilateral hip pain, and he
ordered an x-ray to rule out any type of arthritic changes. (R.
147). The x-ray, which was performed the next day, showed "[n]o
significant bony abnormality involving the left hip joint." (R.
152).

Plaintiff was seen by Dr. Ratchford on December 1, 2003 to
discuss the results of his hip x-ray. Although the x-ray was
negative, Plaintiff continued to complain of hip pain and general
achiness. However, the pain had decreased since he was no longer
working. Dr. Ratchford's assessment was musculoskeletal pain, an
anxiety disorder and obesity (285 pounds). Plaintiff was urged
to lose weight and to start an exercise program. (R. 146).

11

On December 15, 2003, Plaintiff saw Dr. Ratchford for complaints of chronic back pain and difficulty sleeping. Plaintiff reported daytime fatigue due to not sleeping well, stating that he believed he snored. Dr. Ratchford's assessment was chronic low back pain and probable sleep apnea.[15] Dr. Ratchford's plan included continued physical therapy and a sleep study.[16] At the time of this office visit, Plaintiff weighed 290 pounds. (R. 145).

At some point, Plaintiff's medication for depression and anxiety was changed from Zoloft to Prozac.[17] On January 2, 2004, Dr. Ratchford treated Plaintiff for a rash that had developed after Plaintiff started taking Prozac. At the time of this office visit, Plaintiff's weight had increased to 296 pounds.

---

[15]Sleep apnea is a condition characterized by stopped breathing during sleep. These periods of lack of breathing, or apneas, are followed by sudden attempts to breathe. These attempts are accompanied by a change to a lighter stage of sleep. The result is fragmented sleep that is not restful, leading to excessive daytime drowsiness. www.nlm.nih.gov/medlineplus/ encyclopedia (last visited 3/17/2008).

[16]Plaintiff was initially evaluated for physical therapy due to bilateral hip pain on December 4, 2003. The records of Crichton Rehabilitation indicate that Plaintiff's employer was Berkebile Masonry and that he was attending physical therapy through workers compensation. Plaintiff attended physical therapy sessions on December 8, 2003 and December 10, 2003. On December 15, 2003, Plaintiff called Crichton Rehabilitation to inform the facility that his physical therapy was on hold until he saw his physician. (R. 133-37).

[17]Prozac is used to treat depression, obsessive-compulsive disorder, some eating disorders and panic attacks. www.nlm.nih. gov/medlineplus/druginfo (last visited 3/17/2008).

12

Dr. Ratchford treated Plaintiff for the rash and indicated that Plaintiff's medication for depression and anxiety would be changed. (R. 144).

During Plaintiff's office visit on January 16, 2004, Dr. Ratchford noted that Plaintiff had problems with depression and anxiety; that Plaintiff had not been on any medication for these problems since his adverse reaction to Prozac; that Plaintiff wanted a new medication for his depression and anxiety because the Prozac had helped him; that Plaintiff, who is a loud snorer, does not sleep well resulting in daytime fatigue; and that Plaintiff had not yet heard about his sleep study. Dr. Ratchford's assessment was depression with anxiety, probable sleep apnea and low back pain. The doctor prescribed Paxil for Plaintiff and indicated that Plaintiff would be scheduled for a sleep study, if approved. (R. 143).

During his February 12, 2004 appointment with Dr. Ratchford, Plaintiff continued to complain of low back pain which was radiating into his buttocks and legs. Plaintiff also reported that his depression and anxiety seemed to be a little worse despite the Paxil. Dr. Ratchford's assessment was chronic low back pain with radiculopathy and depression with anxiety. He increased the dosage of Plaintiff's Paxil and scheduled an MRI of Plaintiff's back. (R. 142). The impression of the MRI, which was performed the next day, was described as follows: "Mild

13

degenerative disease of the lumbar spine with slight degenerative disc disease at the L2-3 level. There is no evidence of an enhancing abnormality." (R. 151).

Plaintiff saw Dr. Ratchford to review his MRI results on February 25, 2004. Dr. Ratchford noted that Plaintiff's MRI was "normal except for some mild degenerative changes at the disc between L2-3." Dr. Ratchford attributed "a lot" of Plaintiff's pain to his obesity (293 pounds), and he prescribed Lodine for Plaintiff.[18] (R. 141).

On March 24, 2004, Dr. Maryanne Martin, a psychiatrist at Cambria County MH/MR, evaluated Plaintiff based on a referral from Dr. Ratchford. With respect to Plaintiff's mental status examination, Dr. Martin noted that Plaintiff was morbidly obese and had difficulty breathing during the interview. Dr. Martin described Plaintiff's grooming and hygiene as fair. Plaintiff was tearful during the interview, indicating that he was feeling depressed. However, Plaintiff was oriented to time, place and person; his speech was logical and coherent; and he did not express delusions. Dr. Martin described Plaintiff's insight and judgment as fair, and she estimated Plaintiff's level of intelligence to be average. Dr. Martin's impressions were Major Depressive Disorder (Axis I); arthritis, degenerative disc

---

[18]Lodine is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

14

disease, carpal tunnel syndrome and possible sleep apnea (Axis III); and a current GAF of 50 (Axis V).[19] Dr. Martin indicated that individual psychotherapy was appropriate for Plaintiff, noting that he had already begun such therapy with Sarah Bhasker. (R. 256-58).

On April 2, 2004, Plaintiff was treated by Dr. Ratchford for bronchitis. Plaintiff reported that he had decreased his smoking to about 1 pack of cigarettes every 2 weeks. At the time of this office visit, Plaintiff's weight had increased to 308 pounds. Dr. Ratchford prescribed medication for Plaintiff and instructed him to follow-up as needed. (R. 139). On April 13, 2004, Plaintiff was seen by Dr. Ratchford for back pain and a "bit of a

---

[19]The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("*DSM-IV*"), uses a multiaxial approach to diagnosing mental health disorders because rarely do other factors in a person's life not impact their mental health. Axis I is what is typically thought of as the person's diagnosis. Axis II is a person's developmental disorders or personality disorders. Axis III are physical conditions which play a role in the development, continuance or exacerbation of Axis I and Axis II disorders. Axis IV are psychosocial stressors, or events in a person's life, that can impact the disorders listed in Axis I and Axis II. Finally, Axis V is the clinician's rating of the person's level of functioning on the Global Assessment of Functioning "GAF" Scale, which is used by clinicians to report an individual's overall level of functioning. The GAF scale does not evaluate impairments caused by physical or environmental factors. Rather, it considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness. The highest possible score is 100, and the lowest is 1. GAF scores between 41 and 50 denote **"serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV, at 32-34 (bold face in original).

15

cough," and the doctor prescribed medication. (R. 140).

On April 27, 2004, Eric Bernstein, Psy.D., performed a psychological evaluation of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. In a report prepared on May 4, 2004, Dr. Bernstein described Plaintiff as adequately groomed with fair hygiene, and he noted that Plaintiff was well-mannered and cooperative throughout the evaluation. With respect to Plaintiff's mental status examination, Dr. Bernstein noted that Plaintiff was markedly obese, weighing 310 pounds, and that Plaintiff rated his self esteem as 3 on a scale of 1 to 10. Plaintiff maintained direct eye contact with Dr. Bernstein throughout the evaluation, showing no "marked" signs of anxiety. Plaintiff reported feelings of depression including anger, irritability, frustration, loneliness, social withdrawal and increased appetite. Plaintiff was oriented to person, place, situation and time, and his fund of general knowledge and abstract reasoning skills appeared adequate. Plaintiff's response to hypothetical social situations appeared appropriate, and he spoke clearly and logically. Plaintiff exhibited no evidence of loose associations or tangential thinking, and his immediate, recent, recent past and remote memory appeared intact. Plaintiff's impulse control and judgment appeared adequate, and Plaintiff's insight into his emotional difficulties appeared fair. Dr. Bernstein's diagnostic impressions were Pain disorder

associated with both psychological factors and a chronic medical condition (Axis I); emphysema by patient report and severe obesity (310 pounds) (Axis III); a psychosocial stressor of unemployment (Axis IV); and a GAF of 53 (Axis V).[20]  Dr. Bernstein described Plaintiff's prognosis as fair.  (R. 153-59).

On May 3, 2004, Dr. Frank Bryan, a State agency medical consultant, completed an assessment of Plaintiff's physical RFC. Based solely on a review of the administrative file, Dr. Bryan opined that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour workday; that Plaintiff could sit with normal breaks about 6 hours in an 8-hour workday; that Plaintiff had no limitations on his ability to push and pull with his upper and lower extremities; and that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 161-65).  In a form captioned "RFC Continuation," Dr. Bryan opined that Plaintiff's allegations regarding back pain were only partially credible based on the medical evidence in the record.[21]

---

[20]A GAF score between 51 and 60 denotes **"moderate symptoms** (e.g., flat affect and circumstantial speech, or occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends or conflict with peers or co-workers)." DSM-IV, at 32-34 (bold face in original).

[21]In the RFC Continuation form, Dr. Bryan also noted: "There is evidence that he stopped working for reasons unrelated to the alleged impairments.  The medical record records (sic) on 5/13/03, 'The patient having problems at work and quit secondary to the stress and having trouble with his boss.'"  (R. 185).  This

17

(R. 185).

On May 10, 2004, Roger Glover, Ph.D., a State agency psychological consultant, completed a Psychiatric Review Technique form based solely on a review of Plaintiff's administrative file. Dr. Glover evaluated Plaintiff's mental impairment under Listing 12.04 of the Social Security Regulations relating to Affective Disorders, concluding that Plaintiff did not meet the requirements of this listing. Regarding the functional limitations caused by Plaintiff's mental impairment, Dr. Glover concluded that Plaintiff was mildly limited with respect to activities of daily living and social functioning; that he was moderately limited with respect to concentration, persistence and pace; and that there was no evidence of episodes of decompensation, each of extended duration.[22]  (R. 166-80).

_____

statement is erroneous and, therefore, does not support Dr. Bryan's assessment of Plaintiff's credibility. The evidence in the administrative file shows that the job which Plaintiff quit due to problems with his boss was a construction job with State Corporation that he held from January 2003 to April 2003. From April 2003 until his alleged onset of disability in October 2003, Plaintiff was employed by Berkebile Construction. Plaintiff claims that he was asked to leave his employment with Berkebile Construction in October 2003 due to his health problems. (R. 155, 256).

[22]Dr. Glover also completed a Mental RFC Assessment for Plaintiff on May 10, 2004, based on his review of the administrative file. Dr. Glover concluded that Plaintiff's allegations were only partially credible, finding that Plaintiff was "not significantly limited" or only "moderately limited" in numerous abilities relating to Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation. (R. 181-84).

Plaintiff was seen by Dr. Ratchford on June 11, 2004 for a complaint of left knee pain,[23] and the doctor's assessment was infra-patellar bursitis. Feldene, Prednisone and Lortab were prescribed for Plaintiff,[24] and ice, rest and elevation were recommended. Plaintiff's weight at the time of this office visit was 312 pounds. (R. 314).

Three days later, on June 14, 2004, Plaintiff was admitted to Conemaugh Valley Memorial Hospital following a motor vehicle accident in which he sustained a clavicular fracture and T3, T4 and T5 burst fractures, requiring surgery. Due to Plaintiff's high risk for deep vein thrombosis ("DVT") and the fact that the neurosurgeon had requested no anticoagulation medication for at least 72 hours postoperatively, a plan was devised for Plaintiff to undergo caval interruption through the use of an inferior vena cava filter to prevent pulmonary embolization.[25] On June 16,

---

[23]Plaintiff indicated that the pain started the previous day, and that the night before the pain started, he had been crawling under a car to help his son work on it. (R. 314).

[24]Feldene is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. Prednisone is used to treat, among other things, certain types of arthritis. Lortab is a combination of drugs (Acetaminophen and Hydrocodone) used to relieve moderate to moderately severe pain. Lortab can be habit-forming. www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

[25]The most common cause of a pulmonary embolism is a blood clot in the veins of the legs, called DVT. Many blood clots clear up on their own, though some may cause severe illness or even death. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 3/17/2008).

19

2004, Plaintiff underwent surgery for fixation of his thoracic spine fractures.[26]  (R. 188-237, 244-48).

On June 22, 2004, Plaintiff was transferred to UPMC Lee Regional Hospital for rehabilitation.  Plaintiff gradually improved and he was discharged on July 6, 2004.  (R. 321-26). During a follow-up visit with Dr. Ratchford on July 30, 2004, Plaintiff reported that he was feeling well and walking without a walker, and that his pain was improving.  Plaintiff weighed 291 pounds, a loss of 21 pounds since his last office visit with Dr. Ratchford on June 11, 2004.  (R. 313).

On August 17, 2004, a member of the medical staff at Cambria County MH/MR completed a medication summary for Plaintiff.  At the time, Plaintiff was taking Wellbutrin for his depression. Plaintiff's diagnoses were described as Major Depressive Disorder (Axis I); obesity, status post MVA, arthritis, degenerative disc disease, carpal tunnel syndrome and sleep apnea (Axis III); a psychosocial stressor of his girlfriend's pregnancy (Axis IV); and a GAF of 65 (Axis V).[27]  (R. 240).

---

[26]The records of this hospitalization describe Plaintiff's past medical history as follows: "Degenerative disk disease, extreme weight 316 pounds, depression and anxiety."  (R. 230).

[27]GAF scores between 61 and 70 denote "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**."  DSM-IV, at 32-34 (bold face in original).

During an office visit with Dr. Ratchford on September 17, 2004, Plaintiff reported that he was slowly getting his movement back following the surgery on his thoracic spine, but he was bothered by anxiety. In the notes of this office visit, Dr. Ratchford indicated that he would try to wean Plaintiff off Morphine because he seemed to be doing okay, and he prescribed Klonopin for Plaintiff's anxiety.[28] At the time of this office visit, Plaintiff weighed 286 pounds. (R. 312).

In a letter to Dr. Ratchford dated September 28, 2004, Dr. Narayan Nayak, the surgeon who had operated on Plaintiff after the motor vehicle accident in June 2004, noted that Plaintiff had undergone "thoracic spine decompression at T3, T4, and T5 with pedicle screw fixation of T1/T2 and T6/T7 with excellent results." Dr. Nayak also noted that Plaintiff's neurological examination was stable; a recent MRI showed that the hardware in Plaintiff's thoracic spine was intact; and there was no evidence of worsening kyphosis.[29] Finally, Dr. Nayak noted that Plaintiff had been instructed to "take the brace off and start activating slowly and progressively." (R. 243, 249).

---

[28]Klonopin is used to control seizures. It is also used to relieve anxiety. www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

[29]Kyphosis is a curving of the spine that causes a bowing of the back, which leads to a hunchback or slouching posture. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 3/17/2008).

21

Plaintiff saw Dr. Ratchford on October 27, 2004, complaining of edema in his lower extremities and feet. Since his last office visit, Plaintiff had gained 14 pounds, weighing 300 pounds. Dr. Ratchford indicated that he was going to recheck Plaintiff's legs for DVT, noting that Plaintiff had a vena cava filter in place. Lasix was prescribed for Plaintiff, and he was instructed to keep his legs elevated. (R. 311).

Plaintiff was seen by Dr. Martin at Cambria County MH/MR for a follow-up visit on January 5, 2005. This visit was Plaintiff's fifth follow-up visit with Dr. Martin to adjust his medications since his initial psychiatric evaluation on March 24, 2004. (R. 253).

Plaintiff's therapist, Sarah Bhasker, completed a summary of Plaintiff's counseling on February 16, 2005. Ms. Bhasker noted that Plaintiff had attended seven psychotherapy sessions; that Plaintiff had recently sustained vertebral injuries in a motor vehicle accident, rendering him unable to bend or stand for long periods of time; that Plaintiff was depressed about his "dysfunctional family system," *i.e.*, the behavioral problems of his girlfriend's children and a new baby; and that Plaintiff was experiencing financial difficulties due to unemployment. Ms. Bhasker also noted that Plaintiff had anger issues due to his depression, constant pain and inability to work or perform household chores as a result of his health problems. Finally,

22

Ms. Bhasker noted that Plaintiff was no longer in active counseling due to a lack of motivation.[30] Ms. Bhasker's recommendations included continued use of psychotropic medications and psychotherapy sessions, and she noted that Plaintiff's prognosis was "not good." (R. 254-55).

Ms. Bhasker completed another counseling summary for Plaintiff on March 9, 2005. Ms. Bhasker noted that Plaintiff's progress in ameliorating his depression and improving his coping skills was minimal, and that his progress was moderate with respect to controlling angry outbursts. Ms. Bhasker described Plaintiff's prognosis as fair, noting that he needed to attend psychotherapy sessions on a regular basis without canceling or failing to keep his appointments. (R. 259-60).

On March 14, 2005, Dr. Ratchford wrote a letter to Plaintiff's counsel regarding his treatment of Plaintiff and the effect of Plaintiff's medical conditions on his ability to work. The letter states in relevant part:

\*    \*    \*

As a result of these injuries Mr. Miller has constant back pain with difficulty transferring and ambulating. I do not believe he would be able to lift, bend, stair climb, or do any type of manual labor, even very light work. Mr. Miller also suffers from severe anxiety and stress from his aforementioned injuries. He continues to take narcotic pain

_____

[30]According to Ms. Bhasker's summary, Plaintiff had 17 appointments for psychotherapy sessions. However, he only kept 7 of the appointments, cancelling 5 appointments and failing to show for 5 appointments. (R. 254).

medications for his pain as well as a blood thinner, Warfarin, as a result of deep vein thrombosis.

\* \* \*

(R. 329).

Plaintiff was seen by Dr. Ratchford on May 24, 2005 for worsening lower extremity edema. Plaintiff reported that he was on his legs "quite a bit" throughout the day, and the doctor noted that Plaintiff's legs did seem to be more swollen. Dr. Ratchford's assessment was lower extremity edema, likely due to some venous insufficiency and obesity (310 pounds). The doctor increased Plaintiff's dosage of Lasix, prescribed knee high hosiery for Plaintiff to wear during the day while he was on his feet, and encouraged Plaintiff to lose weight. (R. 309). Plaintiff was seen for a follow-up visit on June 1, 2005, approximately one week later. At that time, Plaintiff reported decreased swelling in his legs. However, his weight had increased to 319 pounds.

On June 11, 2005, Plaintiff was treated at Conemaugh Valley Memorial Hospital for complaints of leg tingling and left thigh pain. Due to Plaintiff's history of DVT, a Doppler study was performed; however, the study showed no evidence of DVT in Plaintiff's left lower extremity. The doctor treating Plaintiff concluded that his complaint appeared to be muscular pain. Plaintiff was given Lortab for pain relief and instructed to follow-up with Dr. Ratchford. (R. 468-70).

24

Plaintiff's follow-up visit with Dr. Ratchford was scheduled for June 15, 2005. Plaintiff reported that the swelling seemed to be better, but he continued to have problems with low back pain radiating into his left thigh. Plaintiff's examination revealed some mild palpable pain in his lower back. However, his straight leg raise test was negative bilaterally, and the muscle strength in his lower extremities was 5/5. During this office visit, Plaintiff weighed 334 pounds, a gain of 15 pounds in two weeks. (R. 307). On July 12, 2005, Plaintiff underwent an MRI of his lumbar spine for low back pain and left lower extremity radiculopathy. The MRI was described as "unremarkable." (R. 346).

During an office visit with Dr. Ratchford on August 23, 2005, Plaintiff complained of tingling in his bilateral toes, pain and numbness in his left thigh, low back pain and his weight (324 pounds). Examination of Plaintiff's low back revealed some muscle tenderness, especially on the left; however, the muscle strength in Plaintiff's lower extremities was 5/5. Although the recent MRI of Plaintiff's lumbar spine showed no disc disease or herniated disc, Dr. Ratchford noted that the symptoms in Plaintiff's lower extremities could be some type of neuropathy. Dr. Ratchford indicated that Plaintiff would be given a weight loss diet and tests would be ordered. (R. 306).

During an office visit with Dr. Ratchford on August 29,

25

2005, Plaintiff reported that he had been "doing okay" with respect to his chronic back pain, although the pain seemed to be increasing. Plaintiff also indicated that he was contemplating trying to get a sedentary job.[31] Plaintiff was continued on Percocet. (R. 305).

On September 25, 2005, Plaintiff was treated at Conemaugh Valley Memorial Hospital for a complaint of left knee pain of several days' duration. At the time, Plaintiff weighed 315 pounds. The impression was left knee medial collateral ligamental strain. Darvocet was prescribed for Plaintiff,[32] and he was instructed to use a cane for one week to walk. Plaintiff also was given a knee brace to wear for 2 or 3 weeks, and he was instructed to lose weight. (R. 315).

On September 27, 2005, Dr. Ratchford completed an information request for the Domestic Relations Section of the Cambria County Court of Common Pleas regarding Plaintiff's ability to work. Dr. Ratchford indicated that Plaintiff had been continuously disabled since June 2004, and that Plaintiff would never be able to perform manual labor, which was his prior

---

[31]With respect to Plaintiff's indication that he was thinking about looking for a sedentary job, Dr. Ratchford noted that Plaintiff will never "be able to do any manual type of labor." (R. 305).

[32]Darvocet is a combination of drugs (Acetaminophen and Propoxyphene) used to relieve mild to moderate pain. www.nlm. nih.gov/medlineplus/druginfo (last visited 3/17/2008).

26

occupation. (R. 331-32).

On September 28, 2005, Plaintiff saw Dr. Ratchford for a complaint of left knee pain. The doctor's assessment was described as "Left knee pain, possible medial meniscus tear, Chronic back pain." Dr. Ratchford noted that Plaintiff would be fitted for a knee brace, and that physical therapy would be prescribed if the knee pain continued. (R. 304). On November 2, 2005, Plaintiff saw Dr. Ratchford for a continued complaint of left knee pain. The doctor's assessment was possible arthritis or meniscal injury. Feldene and physical therapy were prescribed for Plaintiff. (R. 303).

On November 9, 2005, Plaintiff presented to Conemaugh Memorial Medical Center with a complaint of left knee pain. X-rays revealed only very minor hypertrophic changes along the medial tibial plateau and well preserved joint spaces. (R. 344-45). On November 21, 2005, Plaintiff saw Dr. Ratchford to follow-up on his left knee pain. Plaintiff reported that the knee continued to bother him "a little bit" and he expressed concern about his weight (314 pounds). Dr. Ratchford's assessment included osteoarthritis of the left knee, hypertension and history of right lower extremity DVT.[33] Plaintiff was urged

---

[33]Dr. Ratchford noted that Plaintiff had had a blood clot in his right lower extremity in November 2004, and that non-invasive testing in June 2005 had revealed stabilization of the clot with no change. Plaintiff was instructed during this office visit to discontinue Coumadin, an anticoagulant or "blood thinner" used to

to continue weight loss efforts and to continue taking Feldene.
(R. 302).

On December 28, 2005, Dr. Bernstein performed another
consultative psychological evaluation of Plaintiff. In his
report, Dr. Bernstein noted that Plaintiff was cooperative and
openly shared his thoughts and feelings. Plaintiff reported that
he had been removed from the home he shared with his girlfriend
by the Office of Children, Youth and Family Services,[34] and that
he was experiencing distress as a result of being separated from
his daughter for 7 months. Plaintiff also reported that he had
been homeless from July 2005 to November 2005, and that since
November 2005, he had been living in a camper with no running
water or utilities. In addition to emotional pain, Plaintiff
reported physical pain in his knees and entire back. Plaintiff
also reported that he attended mental health counseling on an
inconsistent and sporadic basis; that he smoked 2½ packs of
cigarettes a day; and that he walked 2 miles everyday for
exercise.[35]  With respect to Plaintiff's mental status

prevent blood clots from forming or growing larger in your blood
and blood vessels.  www.nlm.nih.gov/medlineplus/druginfo (last
visited 3/17/2008).

[34]Apparently, this action was taken as a result of an
accusation against Plaintiff by his girlfriend's 12-year old son.
(R. 451).

[35]With respect to daily activities, Plaintiff told Dr.
Bernstein that he "spends most of his days playing cards,
watching movies or taking his daily 2-mile walk."  (R. 453).

28

examination, Dr. Bernstein noted that Plaintiff described himself
as feeling worthless, rating his self-esteem a 2 on a scale of 1
to 10; that Plaintiff was severely obese and unkempt; that
Plaintiff was oriented to person, place, time and situation; that
Plaintiff's attention and concentration were impaired; that
Plaintiff spoke clearly and logically with no evidence of loose
associations, tangents or oddity; and that Plaintiff's short-term
memory appeared to be impaired. Dr. Bernstein's diagnostic
impressions included Pain Disorder associated with both
psychological factors and a chronic health condition (Axis I);
severe obesity, arthritis and back pain by report (Axis III);
psychosocial stressors of unemployment, housing difficulties and
primary support problems (Axis IV); and a GAF of 44 (Axis V).
Dr. Bernstein described Plaintiff's prognosis for change as
"guarded," noting that Plaintiff reported no willingness or
motivation to return to work. (R. 451-54).

Dr. Bernstein also completed a questionnaire concerning the
effect of Plaintiff's mental impairment on his work-related
abilities. With respect to various abilities related to
understanding, remembering and carrying out instructions, Dr.
Bernstein indicated that Plaintiff was only slightly or
moderately limited. As to various abilities related to
responding appropriately to supervision, co-workers and work
pressures, Dr. Bernstein indicated that Plaintiff had no

29

limitations or only slight limitations. (R. 456-57).

On January 6, 2006, Dr. S.P. Barua conducted an orthopedic examination of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. Plaintiff reported his chief complaints to be pain in his dorsal and lumbar spines, pain in the left knee and depression.[36] With respect to Plaintiff's physical examination, Dr. Barua noted that Plaintiff weighed 340 pounds; that he was able to get on and off the examining table; that he was unable to stand on his heels and toes; that he was unable to squat or kneel because of left knee pain; that his thoracic and lumbar spines were tender on palpation with mild muscle spasm; and that his straight leg raise test was negative. Dr. Barua described his diagnoses as follows:

DIAGNOSES:

Status post compression fractures of T3-T4 with pedicle screw rod fusion from T1-T6 with posttraumatic chronic dorsal pain. The patient also has degenerative joint and disc of the lumbar spine with chronic lumbar strain. There is no radiculopathy in the lower extremities. The patient also suffers from depression and also suffers from exogenous obesity. Using a cane is helpful because of his left knee pain, but this is not absolutely necessary. He certtainly (sic) would be restricted from any type of physical work because of his severity of pain in the entire spine.

(R. 443-45).

Dr. Barua also completed an assessment of Plaintiff's

---

[36]On a scale of 1 to 10, Plaintiff rated his pain level a 7, indicating that he took 2 Percocet tablets every 6 hours for the pain, as well as Wellbutrin and Paxil for his depression. (R. 443-44).

ability to perform work-related physical activities on January 6, 2006. Dr. Barua opined that Plaintiff could (a) occasionally lift and carry 10 pounds and frequently lift and carry 5 pounds; (b) stand/walk for a total of 6 hours in an 8-hour workday but not without interruptions; and (c) sit for a total of 6 hours in an 8-hour workday but not without interruptions. Dr. Barua further opined that Plaintiff could never climb, stoop, kneel, balance, crouch or crawl; that Plaintiff's impairments affected his ability to reach and push/pull; and that Plaintiff should avoid heights, humidity and temperature extremes. (R. 448-50).

On January 25, 2006, a member of the medical staff of Cambria County MH/MR completed a Medication Summary for Plaintiff, listing Plaintiff's medications as Wellbutrin and Trazadone.[37] Plaintiff's diagnoses were described as Major depressive disorder, recurrent, unspecified (Axis I); MVA, back problems (Axis III); a psychosocial stressor of family problems (Axis IV); and a GAF of 65 (Axis V). (R. 403).

Plaintiff's records from Cambria County MH/MR also include a questionnaire concerning Plaintiff's mental impairments and treatment, as well as a medical source statement of Plaintiff's ability to perform work-related mental activities. These documents appear to have been completed in January 2006 in

---

[37]Trazadone is used to treat depression. www.nlm.nih.gov/medlineplus/druginfo (last visited 3/17/2008).

conjunction with the above-mentioned Medication Summary.
However, the documents are not dated or signed. The
questionnaire indicates, among other things, that Plaintiff
occasionally experiences "fairly intense" panic attacks; that
Plaintiff is not capable of managing benefits in his own behalf;
and that Plaintiff has trouble concentrating on tasks and cannot
remember things on a daily basis. (R. 404-07). The medical
source statement indicates that Plaintiff is markedly or
extremely limited in various areas relating to the ability to
understand, remember and carry out instructions and the ability
to respond appropriately to supervision, co-workers and pressures
in a work setting. (R. 408-10).

On February 8, 2006, Dr. Steven B. Gelfand performed a
neurologic examination of Plaintiff at the request of the
Pennsylvania Bureau of Disability Determination. Dr. Gelfand
noted that Plaintiff's sensation from C2 down to the S1 vertebrae
was normal; that the motor strength in Plaintiff's upper and
lower extremities was 5/5; that Plaintiff walked with an antalgic
gait due to arthritis in his knees; that Plaintiff's range of
motion was limited; that Plaintiff was able to walk on his heels
and toes; and that Plaintiff showed no evidence of muscle wasting
or weakness throughout his neuromuscular system. Dr. Gelfand's
diagnostic impression was described as follows: "Traumatic injury
of the thoracic vertebrae at multiple levels, producing ongoing

32

pain and inability to lift or carry secondary to that pain. He
has legitimate injuries with significant surgical intervention in
the thoracic region." (R. 437-38).

Dr. Gelfand also completed an assessment of Plaintiff's
ability to perform work-related physical activities on February
8, 2006. Dr. Gelfand opined that Plaintiff's ability to lift and
carry was limited to 10 pounds; that Plaintiff's ability to
stand/walk was limited to 1 to 2 hours in an 8-hour workday; that
Plaintiff's ability to sit was limited to 30 minutes in an 8-hour
workday; that Plaintiff could never stoop, kneel, crouch or crawl
and only occasionally climb and balance; that Plaintiff could not
push/pull due to his impairments; and that Plaintiff's
impairments resulted in many environmental restrictions,
including an inability to work near fumes, chemicals, humidity,
dust and temperature extremes. (R. 439-41).

### III. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide
that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides. Based upon the pleadings and the
administrative record, the district court has the power to enter
a judgment affirming, modifying or reversing the Commissioner's

33

decision with or without a remand for a rehearing. The
Court's review of the Commissioner's decision is limited to
determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## IV.  Legal Analysis

### A.  The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months.  42 U.S.C.
§ 423(d)(1).  A Social Security claimant is considered unable to
engage in any substantial gainful activity only if his physical
or mental impairment or impairments are of such severity that he

34

is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*    \*    \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity. 20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987). In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment. 20 C.F.R.
§ 404.1520(c). If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work. 20 C.F.R. § 404.1520(d). If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five. Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work. 20 C.F.R.
§ 404.1520(d). The claimant bears the burden of
demonstrating an inability to return to her past
relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

35

> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's five-step sequential evaluation in the present case, step one was resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability of October 31, 2003. (R. 19). As to step two, the ALJ found that the medical evidence established the following severe impairments: obesity, thoracic and lumbar disc disease, trochanteric bursitis of the hips, a major depressive disorder, a pain disorder and prescription opiate dependence. (R. 28). Regarding step three, the ALJ found that Plaintiff's impairments did not meet or equal the requirements of any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 1.00 relating to disorders of the musculoskeletal system and Listing 12.00 relating to mental disorders. (R. 20).

36

Turning to step four, the ALJ found that Plaintiff was unable to perform his past relevant work due to the exertional level of the work, *i.e.* heavy. (R. 27). Finally, at step five, based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education, past work experience and RFC, there were a significant number of jobs at the light exertional level in the national economy which Plaintiff could perform. Thus, Plaintiff was not disabled. (R. 27).

## B. Discussion

Plaintiff raises four arguments in support of his motion for summary judgment which will be addressed seriatim.

i

In assessing the credibility of a claimant's statements regarding pain and its effect on his or her ability to work, one of the factors to be considered by the ALJ is the type of medication the claimant takes to alleviate the pain. *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), Social Security Ruling 96-7p. In finding Plaintiff's subjective allegations of disabling pain "exaggerated and not fully credible" (R. 21), the ALJ addressed this factor. However, rather than finding that Plaintiff's use of "potent pain analgesics" supported his allegations of disabling pain, the ALJ concluded that Plaintiff's daily use of strong pain medication was attributable to prescription opiate dependence. (R. 23). Plaintiff asserts that

37

the ALJ erred in finding that he suffers from prescription opiate dependence. After consideration, the Court agrees.

A thorough review of the administrative file in this case reveals no evidence from which a finding could be made that Plaintiff's daily use of strong pain medication is attributable to drug dependence. Rather, the finding of drug dependence is based on impermissible speculation by the ALJ due to Plaintiff's abuse of alcohol in the past and his continued abuse of nicotine. No treating or examining medical source has ever questioned the legitimacy of Plaintiff's need for pain medication, and no treating or examining medical source has ever suggested that Plaintiff may be suffering from prescription opiate dependence.[38]

---

[38]In his decision, the ALJ found that Plaintiff's primary care physician continued to prescribe Morphine for Plaintiff despite scant evidence to support allegations of unbearable pain. (R. 23). In this connection, the Court notes that the first reference to Plaintiff's use of Morphine to control pain was in conjunction with the motor vehicle accident in June 2004, in which Plaintiff sustained the traumatic injuries to his thoracic spine. Specifically, the Emergency Room physician noted that a CT scan of Plaintiff's chest was performed due to Plaintiff's "moderately severe pain requiring Morphine." (R. 225). In the notes of a follow-up visit with Dr. Ratchford in September 2004, Plaintiff reported that he was slowly getting his movement back and Dr. Ratchford indicated that he would "try to wean" Plaintiff off the Morphine because he "seem[ed] to be doing okay." (R. 312). Despite this notation, at the time of the first hearing before the ALJ in February 2005, Plaintiff testified that he continued to take Morphine, as well as Percocet, for his pain. (R. 496). However, this is the last reference to Morphine in the administrative file. By the time of the second hearing before the ALJ in February 2006, Plaintiff's pain medication was limited to Percocet. (R. 533-34). Thus, the ALJ erred in his second decision by finding that Dr. Ratchford continued to prescribe Morphine for Plaintiff.

38

Based on the ALJ's impermissible finding of prescription opiate dependence to discredit Plaintiff's complaints of disabling pain, the case will be remanded to the ALJ for further consideration.

In addition to the impermissible finding of prescription opiate dependence, the Court notes several other errors in the ALJ's credibility determination. The ALJ found that Plaintiff's "wide range of daily activities" undermined his allegations of disabling pain.[39] (R. 24). However, the evidence on which the ALJ relies to make this finding does not support it. First, the ALJ notes twice that *by June 2005*, Plaintiff was feeling well enough to crawl under a car to help his son work on it. (R. 21-22). This statement is simply wrong. The reference to Plaintiff crawling under a car is contained in office notes relating to Plaintiff's treatment by Dr. Ratchford for a complaint of left knee pain *in June 2004, not June 2005.* (R. 314). This error is significant because the office note regarding Plaintiff crawling under a car was written three days before the motor vehicle accident in which Plaintiff sustained the traumatic injuries to his thoracic spine. Since the ALJ is required to consider all of a claimant's impairments and the most serious of Plaintiff's impairments resulted from the motor vehicle accident on June 14,

---

[39]A claimant's daily activities are another factor to be considered by the ALJ in assessing the credibility of statements regarding pain and its effect on the claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), Social Security Ruling 96-7p.

2004, Plaintiff's statement to Dr. Ratchford about crawling under a car on June 11, 2004 is irrelevant to the disability determination.[40]

Similarly, the ALJ relies on Plaintiff's responses to a Daily Activities Questionnaire to find his allegations of disabling pain "exaggerated and not fully credible." (R. 22-23, 26). The Daily Activities Questionnaire, however, was completed by Plaintiff on March 15, 2004, several months before the motor vehicle accident in which he sustained the traumatic injuries to his thoracic spine. At this time, Plaintiff is seeking DIB and SSI commencing on June 14, 2004, the date of his motor vehicle accident. (Pl's Brief, p. 24). Thus, it is clear that Plaintiff's daily activities before June 14, 2004 are no longer relevant to the credibility determination in this case.[41]

---

[40]In this regard, Social Security Ruling 96-7p provides: "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the *relevant* evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence." (Emphasis added).

[41]The Court also notes in this connection that a review of the Daily Activities Questionnaire completed by Plaintiff on March 15, 2004 shows that the ALJ unfairly characterized Plaintiff's responses to support the finding that Plaintiff engages in a wide range of daily activities, despite his impairments. (R. 116-25). Similarly, a review of Plaintiff's hearing testimony does not support the ALJ's reliance on the testimony to find that, despite his impairments, Plaintiff

40

Finally, in finding Plaintiff's allegations of disabling pain "exaggerated and not fully credible," the ALJ states: "Although the claimant alleges that his disability is secondary to unremitting pain, he admitted that he quit work in April 2003, because of problems at work and trouble with his boss." (R. 23). Again, the ALJ has misinterpreted the evidence in the record in assessing Plaintiff's credibility. As noted in footnote 21, the evidence in Plaintiff's administrative file shows that the job which Plaintiff quit due to problems with his boss was a construction job with State Corporation that he held from January 2003 to April 2003. From April 2003 until his alleged onset of disability in October 2003, Plaintiff was employed by Berkebile Construction, and Plaintiff claims that he was asked to leave his employment with Berkebile Construction in October 2003 due to his health problems. (R. 155, 256). There is no evidence that Plaintiff quit his last job in October 2003 due to problems with his boss, rather than severe pain.

## ii

"Controlling weight" is the term used in the Social Security Regulations to describe the weight an ALJ gives to a medical opinion from a treating source that must be adopted. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Social Security

---

remains capable of engaging in a wide range of daily activities. (R. 22-23, 26, 499-503).

Ruling 96-2p provides that the rule on controlling weight applies when all of the following facts are present: (a) the opinion is from a "treating source;" (b) the opinion is a "medical opinion," *i.e.*, an opinion about the nature and severity of an individual's impairments; (c) the opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques; and (d) the opinion is "not inconsistent" with the other "substantial evidence" in the individual's case file. If any of the above factors is not satisfied, a treating source's medical opinion cannot be entitled to controlling weight. Plaintiff asserts that the ALJ erred by failing to give controlling weight to opinions of his treating physician, Dr. Ratchford, and his treating psychiatrist, Dr. Martin, which he alleges establish that he is disabled. (Pl's Brief, pp. 20-22).

Turning first to Dr. Ratchford, Plaintiff notes that in a letter to counsel dated March 14, 2005, Dr. Ratchford stated: "I do not believe [Plaintiff] would be able to lift, bend, stair climb, or do any type of manual labor, even very light work." (R. 83). Because work at all exertional levels requires some ability to lift, Plaintiff contends that this statement constitutes an opinion by Dr. Ratchford that he is disabled, and that the ALJ erred by not giving controlling weight to this opinion. (Pl's Brief, p. 20). After consideration, the Court finds this argument unpersuasive.

42

As an initial matter, the Court does not agree with Plaintiff that Dr. Ratchford's statement in the March 14, 2005 letter necessarily constitutes an opinion that Plaintiff is unable to perform any type of work. Without a detailed physical capacity assessment by Dr. Ratchford, the statement that he did not "believe" Plaintiff would be able to lift as a result of his back pain is ambiguous. Moreover, subsequent notes and statements by Dr. Ratchford undermine Plaintiff's argument that the statement in the doctor's March 14, 2005 letter constitutes an opinion that Plaintiff is totally disabled. Specifically, during an office visit on August 29, 2005, Plaintiff apparently informed Dr. Ratchford that he was thinking about looking for a sedentary job. In response, Dr. Ratchford noted that Plaintiff "will not ever be able to do any *manual type of labor*." (R. 305). Dr. Ratchford did not state that Plaintiff is unable to perform work at any exertional level. Similarly, on September 27, 2005, Dr. Ratchford completed a Physician's Information Request form for the Domestic Relations Section of the Court of Common Pleas of Cambria County, Pennsylvania, and the following question was on the form: "If still disabled, when should patient be able to return to work?" In response to the question, Dr. Ratchford wrote: "Patient will never be able to do *manual labor*, which was his prior occupation." (R. 331-32). It cannot be inferred from this statement that Dr. Ratchford is of the opinion

43

that Plaintiff is totally disabled. An inability to perform manual labor does not necessarily equate with an inability to perform any type of work.

In addition, as noted above, to be accorded controlling weight, a treating source's medical opinion must not be inconsistent with other substantial evidence in the claimant's administrative file, and this factor is not met in the present case. With respect to Plaintiff's ability to lift, Dr. Barua, who performed the consultative orthopedic examination of Plaintiff on January 6, 2006, opined that Plaintiff was able to lift 10 pounds occasionally and 5 pounds frequently (R. 447), and Dr. Gelfand, who performed the consultative neurological examination of Plaintiff on February 8, 2006, opined that Plaintiff could frequently lift 10 pounds (R. 439). These opinions, which meet the lifting requirements for sedentary work in the Social Security Regulations, constitute substantial evidence that is inconsistent with the statement in Dr. Ratchford's March 14, 2005 letter that Plaintiff is unable to lift due to back pain.

Under the circumstances, the ALJ did not err by failing to give controlling weight to Dr. Ratchford's statement that Plaintiff was unable to lift. However, in light of Dr. Ratchford's long history of treating Plaintiff, on remand, it is recommended that the ALJ obtain a medical source statement of

44

Plaintiff's ability to perform specific work-related physical activities from Dr. Ratchford.

As to Dr. Martin, Plaintiff's "controlling weight" argument is based on three exhibits in the administrative file in this case. However, because none of the exhibits can be construed as an opinion by Dr. Martin that Plaintiff is disabled, there is no opinion of Dr. Martin to which controlling weight could have been given by the ALJ.

With respect to the first exhibit relied upon by Plaintiff in support of his "controlling weight" argument, *i.e.*, the report of Dr. Martin's initial psychological evaluation of Plaintiff on March 24, 2004, as noted previously, Dr. Martin rated Plaintiff's GAF a 50 at that time which denotes serious symptoms. (R. 256-58). Plaintiff argues that this GAF assessment indicates "an inability to maintain employment," and, therefore, an opinion by Dr. Martin that he is disabled by his mental impairments. (Pl's Brief, p. 21). Contrary to this argument, a GAF assessment is not conclusive evidence of disability. While a GAF assessment does constitute medical evidence accepted and relied upon by a medical source and should be addressed by an ALJ in making a disability determination, neither the Social Security Regulations nor case law require an ALJ to decide a disability claim based solely on a GAF assessment. It is but one piece of evidence that an ALJ considers in the analysis of a claimant's limitations.

*See* Ramos v. Barnhart, 513 F.Supp.2d 249, 261 (E.D. Pa.2007). In
the present case, the ALJ considered the GAF of 50 assigned to
Plaintiff by Dr. Martin in March 2004, but correctly noted that
Plaintiff subsequently participated in psychotherapy and, by
August 2004, his GAF had increased to 65, denoting only mild
symptoms. (R. 25, 240). In any event, as noted previously,
Plaintiff is now seeking DIB and SSI commencing June 14, 2004,
the date of his motor vehicle accident. Thus, Dr. Martin's
assessment of his GAF in March 2004 is no longer relevant to the
disability determination in this case.

The second exhibit on which Plaintiff relies in support of
his "controlling weight" argument is a Medication Summary
completed on January 25, 2006 in which Dr. Martin indicated that
Plaintiff's Axis I diagnosis is Major Depression. (R. 403).
However, Plaintiff fails to acknowledge the fact that in the same
Medication Summary, Dr. Martin assigned a GAF of 65 to him,
denoting only mild symptoms. A mere diagnosis does not
constitute an opinion that a claimant is disabled under the
Social Security Act. It is the severity of the limitations
resulting from the diagnosis that determines disability.

The third exhibit on which Plaintiff relies in support of
his "controlling weight" argument is a Questionnaire concerning
Plaintiff's mental disorder which was completed after October 19,
2005. (R. 404-07). The responses to the unsigned, undated

46

Questionnaire indicate that Plaintiff suffers from panic attacks up to 4 times a day, cannot remember things on a daily basis and has trouble concentrating on tasks. (R. 406). Assuming, arguendo, that the information provided in the Questionnaire constitutes an opinion of disability due to a mental impairment, the source of the information is unknown. There is no evidence that the information was provided by Dr. Martin - the treating source. Thus, there is no basis for attributing controlling weight to the alleged opinion of disability.[42]

Based on the foregoing, the ALJ did not err by failing to attribute controlling weight to any alleged opinion of Dr. Martin that Plaintiff is disabled. Like Dr. Ratchford, however, Dr. Martin has a long history of treating Plaintiff for his mental disorder. Accordingly, on remand, it is also recommended that the ALJ obtain a medical source statement from Dr. Martin

---

[42]Plaintiff also argues that Dr. Martin's opinion of disability is corroborated by the consultative psychological examiner, Dr. Bernstein, who opined in December 2005 that Plaintiff's mental impairment resulted in serious symptoms. In this regard, the Court notes that the ALJ adequately discussed Dr. Bernstein's report and explained his reasons for not accepting the GAF of 44 assigned to Plaintiff. First, a GAF of 44 is not supported by the results of Plaintiff's mental status examination by Dr. Bernstein. (R. 26, 453-54). Second, despite assigning a GAF of 44 to Plaintiff, Dr. Bernstein opined that Plaintiff was only slightly limited or moderately limited in various areas relating to his ability to understand, remember and carry out instructions, and not limited or only slightly limited in various areas relating to his ability to respond appropriately to supervision, co-workers and pressures in a work setting. (R. 26, 456).

47

concerning Plaintiff's ability to perform specific work-related mental activities.

### iii

Social Security Ruling 96-8p provides that the ALJ's RFC assessment must address both the remaining exertional and non-exertional capacities of a claimant. Exertional capacity considers a claimant's limitations and restrictions with respect to physical strength and defines the individual's remaining capacity to perform each of the seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Each strength demand must be considered separately (*e.g.*, "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment combines activities (*e.g.*, "walk/stand, lift/carry, push/pull").

On the other hand, non-exertional capacity considers all work-related limitations and restrictions that do not depend upon an individual's physical strength, *i.e.*, all physical limitations and restrictions that are not reflected in the seven strength demands *and* mental limitations and restrictions. Non-exertional capacity assesses an individual's abilities to perform physical activities such as stooping and climbing, and mental activities such as understanding and remembering instructions and responding appropriately to supervision. In addition, non-exertional capacity considers an individual's ability to tolerate various

environmental factors such as temperature extremes. As with exertional capacity, non-exertional capacity must be expressed in terms of work-related functions.

The ALJ's RFC assessment in the present case was described as follows:

"... the [ALJ] will credit the claimant's subjective allegations of pain and discomfort to the extent that the claimant is limited to light exertion, that requires walking and standing for no more than two hours out of an eight hour workday, that requires no more than occasional crouching or crawling, that avoids climbing ladders, ropes, and scaffolds, that avoids prolonged exposure to extreme wetness and humidity and cold temperature extremes."

(R. 24).

Plaintiff asserts that the ALJ's RFC assessment fails to comply with the requirements of Social Security Ruling 96-8p, and, after consideration, the Court agrees. Further, the Court concludes that the ALJ erred in finding that Plaintiff retained the RFC to perform work at the light exertional level.

Turning first to the ALJ's finding that Plaintiff retained the RFC to perform light work, this level of work requires the exertional capacity to lift 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. The only relevant medical opinions which specifically address Plaintiff's capacity to lift are those provided Dr. Barua, who conducted the consultative orthopedic examination of Plaintiff in January 2006, and Dr. Gelfand, who conducted the consultative neurological examination of Plaintiff in February 2006. Both consulting

medical specialists agreed that Plaintiff's lifting capacity is limited to 10 pounds, which is insufficient to establish an ability to perform light work. Despite the absence of any other medical opinions concerning Plaintiff's specific lifting capacity following the June 2004 motor vehicle accident, the ALJ rejected the opinions of Drs. Barua and Gelfand and, instead, found that Plaintiff's lifting capacity met the requirements of light work based on the alleged "minimal objective findings" in this case, as well as Plaintiff's alleged "wide range of daily activities." (R. 24). In so doing, the ALJ impermissibly substituted his own opinion for the opinions of the consulting medical specialists.

As to the requirements of Social Security Ruling 96-8p, a review of the ALJ's RFC assessment shows that he failed to consider Plaintiff's limitations and restrictions with respect to the seven strength demands separately. Rather, the ALJ improperly combined the activities of walking and standing and failed to make separate findings with regard to sitting, carrying, pushing and pulling separately. Under the circumstances, on remand, the issue of Plaintiff's RFC should be re-visited. In this connection, the Court reiterates its recommendation that medical source statements of Plaintiff's ability to engage in work-related physical and mental activities be obtained from Plaintiff's long-time treating sources, Drs. Ratchford and Martin.

Plaintiff also asserts that the ALJ erred by failing to classify several of his impairments as severe or non-severe, *i.e.*, DVT, carpal tunnel surgery, anxiety and chronic low back pain with radiculopathy, and by failing to consider the impact of the functional limitations resulting from these impairments on his ability to work. (Pl's Brief, p. 23). After consideration, the Court finds this argument to be meritless.

With respect to Plaintiff's chronic low back pain, a review of the ALJ's decision shows that he did, in fact, consider this impairment, classifying the impairment as severe and including it in his assessment of Plaintiff's RFC. (R. 19). As to Plaintiff's history of DVT, this physical impairment was not included as a disabling condition in Plaintiff's applications for DIB and SSI,[43] and Plaintiff offered no testimony during either hearing before the ALJ concerning this physical impairment. Moreover, the medical evidence in the administrative file reveals no functional limitations resulting from Plaintiff's history of DVT. Similarly, carpal tunnel syndrome was not included as a disabling condition in Plaintiff's applications for DIB and SSI, and, although Plaintiff testified about this physical impairment at the hearings before the ALJ, there is no objective medical evidence to support

[43]As noted previously, the only physical impairment which was listed as a disabling condition in Plaintiff's applications for DIB and SSI was "arthritis throughout body." (R. 96-97).

a finding that Plaintiff has functional limitations as a result of this physical impairment. In fact, in the report of Plaintiff's consultative neurological examination in February 2006, Dr. Gelfand specifically noted: "Motor examination of the upper extremities reveals deltoid, biceps, triceps, pronator/supinator of forearm, flexors/extensors of the wrist and fingers to be 5/5." (R. 438). Finally, regarding anxiety, Plaintiff's applications for DIB and SSI included a mental impairment described as "bad nerves." (R. 96-97). When asked by the ALJ what he meant by "bad nerves" during the first hearing, Plaintiff responded: "Mood swings. Everything gets to me. I can fly off the wall or there's some times I just sit and cry." (R. 496). However, during the second hearing, Plaintiff testified that his medication was very effective in controlling the mood swings, *i.e.*, he only experienced mood swings when he missed a dose of his medication. (R. 538). Finally, as noted by the Commissioner, Plaintiff has never been diagnosed with an anxiety disorder. (Df's Brief, p. 28). Plaintiff's mental impairment consistently has been diagnosed as a major depressive disorder, and the ALJ included this disorder in Plaintiff's severe impairments.

William L. Standish
United States District Judge

Date: March 31, 2008

52